**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2012**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **MAHDI KEIVAN BAHARI,** | : | **VIOLATIONS:** |
| **A.K.A. MEHDI KEIVAN,** | : | |
| **A.K.A. M. AZIZ,** | : | **18 U.S.C. § 371** |
| **A.K.A. AZIZ BAHARI,** | : | **(Conspiracy)** |
| **MAHSA KEIVAN BAHARI,** | : | |
| **A.K.A. KATRINA SMITCH,** | : | **50 U.S.C. § 1705** |
| **A.K.A. KATRINA SMICH,** | : | **(International Economic** |
| **A.K.A. KATRINA S.A.,** | : | **Powers Act)** |
| **BLUE LINES COMPANY,** | : | |
| **d/b/a MKB PACIFIC AIR SDN BHD,** | : | **31 C.F.R. Part 560** |
| **d/b/a AJMAL AVIATION,** | : | **(Iranian Transactions** |
| | : | **Regulations)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| **Defendants.** | : | **(Material False Statement)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and** |
| | : | **Causing an Act to Be Done)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(c)** |
| | : | **28 U.S.C. § 2461 (c)** |
| | : | **(Criminal Forfeiture)** |

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

Defendants

1.      Defendant BLUE LINES COMPANY ("BLUE LINES") was an aircraft maintenance and parts supply company located in Tehran, Iran.  Defendant BLUE LINES had branch offices in the United Arab Emirates ("UAE") and Turkey.  In addition, defendant BLUE LINES had a "virtual office," meaning that it had no physical address, in Kuala Lumpur, Malaysia, under the name of MKB PACIFIC AIR SDN BHD ("MKB").  Defendant BLUE LINES also operated a location in Ajman, UAE, where it conducted business under the name AJMAL AVIATION.  For purposes of this Indictment, unless otherwise stated, the various companies will be referred to collectively as defendant BLUE LINES.

2.      The Managing Director of defendant BLUE LINES was defendant MAHDI KEIVAN BAHARI ("MAHDI"), an Iranian national.  During the time period relevant to this Indictment, defendant MAHDI used the aliases "Mehdi Keivan," "Aziz Bahari" and "M. Aziz" to disguise his true identity and to further the conspiracy described below.

3.      The Project Manager at BLUE LINES was defendant MAHSA KEIVAN BAHARI ("MAHSA"), also an Iranian national.   Defendant MAHSA also used aliases to conceal her true identity and to further the conspiracy described below.  Her aliases included "Katrina Smitch," "Katrina Smich," and "Katrina S.A."

4.      An unindicted coconspirator ("Coconspirator A"), a Malaysian national, was the Director of a freight forwarder located in Kuala Lumpur, Malaysia ("Freight Forwarder A").

**The International Emergency Economic Powers Act and
the Iranian Transactions Regulations**

5.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701-1706, authorized the President of the United States ("the President") to impose

economic sanctions on a foreign country in response to an unusual or extraordinary threat to the

national security, foreign policy, or economy of the United States when the President declared a

national emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the

President and the executive branch have issued orders and regulations governing and prohibiting

certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

6.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the

President has found that "the situation in Iran constitutes an unusual and extraordinary threat to

the national security, foreign policy and economy of the United States and declare a national

emergency to deal with that threat."

7.       On May 6, 1995, the President issued Executive Order No. 12959, adopting and

continuing Executive Order No. 12170 (collectively, the "Executive Orders"), and prohibiting,

among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran

of any goods, technology, or services from the United States or by a United States person.  The

Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and

regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary

of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the

sanctions imposed by the Executive Orders.

8.      The ITR generally prohibited any person from exporting or causing to be exported

from the United States any goods or technology without having first obtained an export license

from the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"),

which was located in the District of Columbia.  The ITR were in effect at all times relevant to this

Indictment.  The ITR imposed, among others, the following prohibitions:

>Section 560.203 - Prohibition of any Transaction to Evade or Avoid the Embargo and any Attempt to Violate the Embargo:
>
>Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.
>
>Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, or Services to Iran or the Iranian Government:
>
>Except as otherwise authorized [by a license issued by OFAC], the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
>(a)   Such goods, technology, or services are intended specifically for supply . . . directly or indirectly, to Iran or the Government of Iran . . .
>
>Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;
>
>Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:
>
>(1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and
>
>(2) The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

## Export and Shipping Records

9.      Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States.  Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the U.S. Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), which was headquartered in the District of Columbia.  A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States.

10.     An essential and material part of the SED was information concerning the ultimate consignee (commonly known as "end-user") and the country of ultimate destination of the export.  In many cases, the identity and location of the ultimate consignee determined whether the goods may be exported: (a) without any specific authorization from the United States Government; (b) with specific authorization in the form of a license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

11.     The SED was equivalent to a statement to the United States Government that the transaction occurred as described.  The SED was used by the United States Bureau of the Census to collect trade statistics and by the United States Department of Commerce, Bureau of Industry and Security, which was located in the District of Columbia, for export control purposes.

## THE CONSPIRACY

12.     Beginning as early as in or around February 2009, the exact date being unknown

to the Grand Jury, and continuing through in or around August 2012, in the District of Columbia

and elsewhere, the defendants

**BLUE LINES COMPANY,**
**MAHDI KEIVAN BAHARI, and**
**MAHSA KEIVAN BAHARI**

did knowingly and willfully combine, conspire, confederate, and agree with others known and

unknown to the Grand Jury:  (1)  commit an offense against the United States, that is, to export

and cause the exportation of goods from the United States to Iran in violation of the prohibitions

imposed upon that country by the United States Government, without having first obtained the

required licenses from OFAC, located in the District of Columbia, in violation of Title 50,

United States Code, Section 1705, and Title 31, Code of Federal Regulations, Parts 560.203,

560.204, and 560.205 (ITR); and (2) to defraud the United States Department of the Treasury

and the United States government by interfering with and obstructing a lawful government

function by deceit, craft, trickery, and dishonest means, all in violation of Title 18, United States

Code, Section 371.

13.     The conduct alleged in this Indictment occurred within the District of Columbia

and elsewhere, and therefore within the venue of the United States District Court for the District

of Columbia pursuant to Title 18, United States Code, Section 3237(a).  Additionally, the

conduct alleged in this Indictment began outside the jurisdiction of any particular state or district

of the United States, but within the extraterritorial jurisdiction of the United States and therefore,

pursuant to Title 18, United States Code, Section 3238, within the venue of the United States

District Court for the District of Columbia.

## OBJECTS OF THE CONSPIRACY

14.     The objects of the conspiracy were:

A.     to illegally enrich the conspirators by unlawfully exporting goods from the United States to Iran;

B.     to obtain aviation parts and components for Iran;

C.     to evade the prohibitions and licensing requirements of IEEPA and the ITR; and,

D.     to conceal the prohibited activities and transactions from detection by the United States government so as to avoid penalties and disruption of the illegal activity.

## MANNER AND MEANS OF THE CONSPIRACY

15.     The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

A.     Defendants BLUE LINES, MAHDI and MAHSA ordered various aircraft parts from U.S. companies;

B.     Defendants BLUE LINES, MAHDI and MAHSA falsely informed the U.S. companies that the ultimate end-users for the products were located in Malaysia and Turkey;

C.     Defendants BLUE LINES, MAHDI and MAHSA registered a "virtual" company in  Malaysia in order to facilitate the transfer of U.S. goods to Iran;

D.     Defendants MAHDI and MAHSA used aliases when ordering products from the United States to disguise their identities;

E.     Defendants BLUE LINES, MAHDI and MAHSA made arrangements to have freight forwarders in Malaysia and Turkey redirect the U.S. shipments and forward the goods to Iran;

F.      For goods being transshipped through Malaysia, Coconspirator A removed the paperwork from the shipments from the United States to Malaysia, scanned and then sent the paperwork through email to defendants MAHDI and MAHSA.  Defendants MAHDI and MAHSA created new invoices, reflecting a sale of goods from Malaysia to Iran, and emailed those documents to Coconspirator A.  Coconspirator A used the new invoices to send the goods from Malaysia to Iran;

G.      Defendants BLUE LINES, MAHDI and MAHSA did knowingly and willfully make false, fictitious, and fraudulent material statements and representations in a matter within the jurisdiction of the United States Department of Homeland Security, an agency of the executive branch of the government of the United States, in that they concealed the fact U.S. products were being transshipped from the United States, through Turkey or Malaysia, to Iran;

H.      In order to conceal from the United States government that materials were being sold to customers in Iran, defendants BLUE LINES, MAHDI and MAHSA, did purposefully and willfully cause persons in the United States to file SEDs that falsely stated that Malaysia and Turkey were the destinations of U.S. goods intended for Iran; and

I.      Defendants BLUE LINES, MAHDI, MAHSA and others caused products from the United Sates to be sold to individuals and entities in Iran without obtaining a license from OFAC.

## OVERT ACTS

16.      In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the conspirators committed and caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

**Company A Shipment, April 2010**

A.       On or about February 18, 2009, defendant MAHDI, while he was in Iran, signed a "Company Profile" and an End User Certification to obtain parts from Company A, located in Melbourne, Florida, in which he:  (1) described BLUE LINES as an airline consulting company in Dubai, UAE; (2) also stated that the end use of parts purchased from Company A would be for airlines that fly in the UAE and India; and (3) certified that he would not send Company A's parts into Iran, either directly or indirectly.

B.       On or about March 30, 2010, defendant MAHSA ordered from Company A three transceivers for civil aircraft, three indicators for civil aircraft, three installation kits for civil aircrafts, and three additional installation kits.

C.       On or about April 5, 2010, defendants BLUE LINES, MAHDI and MAHSA caused Company A to file false SEDs for the four commodities referenced in Overt Act B, with the SED listing Blue Lines FZE in Istanbul, Turkey as the Ultimate Consignee and Turkey as the destination country, when in truth and in fact, the commodities were destined for Iran.

D.       On or about April 10, 2010, defendant MAHDI sent an email to the Turkish affiliate of the shipping company handling Company A's shipment and asked it to redirect the package to Tehran, Iran, stating: "Please make necessary to forward shipment with AWB # 9257416895 to below address:

> BLUE LINES COMPANY
> [address]
> Jomhoori Sq,
> Tehran, Iran"

E.       On or about April 20, 2010, per defendant MAHDI's instructions, the Turkish company forwarded the shipment referenced in Overt Act D to defendant BLUE LINES in Tehran, Iran.

**Contact With U.S. Customs**

F.      On or about May 24, 2010, in response to CBP seizing two shipments of the

aforementioned three transceivers for civil aircraft, three indicators for civil aircraft, three

installation kits for civil aircrafts, and three additional installation kits to be sent from the U.S. to

defendant BLUE LINES in Turkey, but destined to Iran, defendant MAHSA sent an email to a

DHS Special Agent in which she falsely stated:

> Blue Lines is an MRO (maintenance, repair and overhaul of aircrafts) center and
> established in Ras-Al-Khaymah, UAE.  We always import our needed parts from
> USA and always have respected to their laws about embargoed countries.
> Recently, we established a new company (Blue Lines) in Istanbul, Turkey to
> develop our relationship with Turkish Air Operators, but our partner in Turkey
> office, abused our trust and tried to divert our last shipment, that had been sold by
> an US company to Iran which is an embargoed country.  So, Turkey DHL resent
> all our shipment to USA and our parts were seized by US custom in DHL
> Cincinnati Hub, OH – USA and now I'm informed that your agent takes care of
> this matter.

G.      On or about May 26, 2012, after receiving an e-mail from a DHS agent, defendant

MAHSA responded with an email explaining that Blue Lines has a good reputation in the Middle

East and falsely asserting that the planned transfer to Iran was done "without Blue Lines head

office – in Ras-Al-Khaymah, UAE – awareness."

H.      On or about August 12, 2010, defendants BLUE LINES, MAHDI and MAHSA

filed a petition with Immigration and Customs Enforcement for release of the seized goods in

which they falsely claimed that they had not been apprised of the diversion to Iran, and they

falsely blamed their "partner in Turkey."

**Company B Shipment**

      I.      In an email dated on or about September 21, 2011, defendant MAHSA inquired to

Coconspirator A about transshipping goods to Iran through Malaysia.

      J.      On or about September 27, 2011, Coconspirator A replied to defendant MAHSA

by email with a list of the relevant import and export costs associated with transshipping to Iran.

      K.      On or about September 29, 2011, defendant MAHSA replied by email to

Coconspirator A:

> [Coconspirator A],
> Thanks for your emails.  And hope to start our business soon.
> Please be sure that all of goods are for civil aviation use and doesn't
> include DG [Dangerous Goods].
> Also, as we want to have a long business relationship with your
> company, we expect you that do your best to give us the best price
> and more important don't let the parts to be tracked.
>
> For the first shipment we want to send three small parts.  If you
> agree I can give you more details.
>
> Regards,
> Mahsa Keivan
> Project Manager

      L.      On or about September 29, 2011, MAHSA subsequently told Coconspirator A by

email:

> Dear [Coconspirator A],
> Our first shipment will send to Malaysia directly from our supplier
> from USA.
> Please note that we've registered a new company in Malaysia under
> the name MKB Pacific Air SDN BHD.  But it's still a virtual office.
> So, we want to ask you to receive the shipments that is sent to MKB
> Pacific Air company and resend it to Tehran (Blue Lines).
> I've introduced the consignee to supplier as following:
> MKB Pacific Air SDN. BHD
> C/O [Freight Forwarder A] KLIA, SEPANG, SELANGOR,
> Malaysia.

> The parts will be send by our DHL account and I'll inform you with
> AWB# soon.
>
> Regards,
> Mahsa Keivan
> Project Manager

M.      On or about September 25, 2011, defendant BLUE LINES forwarded a purchase

to Company B, located in Canoga Park, California, for the acquisition of one display unit, one

flight control unit  ("FCU"), and one symbol generator unit ("SGU"), which are components of

the flight and navigational systems of a jet aircraft.  In the same email, defendant BLUE LINES

requested Company B to "send the crates to our Malaysia office under below name:

> Consignee Name:
>
> MKB Pacific Air Sdn Bhd
> C/O [Freight Forwarder A]
> Klia, Sepang, Selangor, Malaysia"

N.      On or about September 30, 2011, defendants BLUE LINES, MAHDI and

MAHSA caused Company B to file a false SED in the AES, reflecting three shipments of aircraft

parts to BLUE LINES and falsely identifying the ultimate destination of each shipment as

Malaysia, when, in truth and in fact, each shipment was destined for Iran.

O.      On or about October 2, 2011, defendant MAHSA advised Coconspirator A in an

email that the "supplier shipped the parts (3 boxes) to your address with DHL AWB numbers

7894724364, 7894717493, and 7894721380."

P.      On or about October 4, 2011, Coconspirator A notified defendant MAHSA by

email, "For shipment awb.no.7894724364 just collected," and also asked for the complete

address of MKB.

Q.      On or about October 4, 2011, defendant MAHSA responded by email, "MKB Pacific Air has been already registered in Malaysia by our company.  It's still a virtual office. We registered this company in Malaysia just to make our transfers easier."

R.      On or about October 19, 2011, Coconspirator A sent an email to defendant MAHSA to which Coconspirator A attached three invoices referencing shipments from the United States and an account statement, and in which Coconspirator A advised, "Your shipment already proceed and we will be send to Iran after we received the money."

S.      On or about October 20, 2011, defendant MAHDI sent an email to Coconspirator A, copying defendant MAHSA, and advising Coconspirator A that the payment had been made and asking that Coconspirator A "release the shipment and ship it with Iran Air's Friday flight to avoid more delay in delivery."

**Company A Shipment, May 2012**

T.      On or about May 8, 2012, defendant MAHSA, using the false name Katrina Smich, MKB Project Manager, contacted Company A of Melbourne, Florida, via email and requested to purchase a 3 axis gyroscope, which was a device for measuring or maintaining orientation of an object in flight and whose applications included inertial navigation systems in ballistic missiles, and  stabilizing unmanned aerial vehicles.

U.      On or about May 9, 2012, defendant MAHSA, again using the false name Katrina Smich, ordered by email a second gyroscope of the same make and model as the first order from Company A, and requested the shipment be sent care of Freight Forwarder A.

V.      On or about May 16, 2012, defendant MAHSA, using the false name Katrina Smich, sent an email to Company A that falsely stated: "Just for your information, MKB Pacific is a local Cargo Operator and we need parts for our Aircrafts and Helicopters."

W.      On or about May 25, 2012, defendants BLUE LINES, MAHDI and MAHSA caused Company A to file a false SED in the AES, which stated that Company A was exporting electrical instruments and appliances for aerospace navigation to MKB located in Kuala Lumpur, Malaysia, via DHL Express, when in truth and in fact the shipment was destined to Iran.

X.      On or about May 25, 2012, defendant MAHSA informed Coconspirator A by email that Coconspirator A would be receiving a shipment under air waybill number 7542269265 for MKB, and instructed Coconspirator A to send this shipment to Tehran via Air Iran and to inform defendant MAHSA of the new Air Iran air waybill number.

**Company C Shipment**

Y.      On or about January 23, 2012, defendant MAHSA submitted by email a request for quotation from defendant BLUE LINES to Company C in Millington, Tennessee, for a "42 Degree Gearbox," which was a component of a helicopter responsible for changing the direction of the tail rotor driveshaft.

Z.      On or about January 23, 2012, defendant BLUE LINES received via email from Company C a quote that included the following advisement:

> Unless otherwise noted, this sale, order, or quote may include Munitions List Items (MLI) or Commerce Controlled List Items (CCLI).  MLI/CCLI property is controlled by the U.S. Government, and in many cases can not be transferred (exported, sold or given) to a foreign country, a non-U.S. Citizen/National, or a non-permanent U.S. Resident, without a valid State/Commerce Department export authorization.  It is the responsibility of you (the purchaser), to determine what the applicable requirements may be, and to obtain all necessary authorizations, licenses, or approvals.

AA.     On or about April 14, 2012, defendant MAHDI, using the false name M. Aziz, Managing Director of MKB, sent a purchase order by email to Company C for the 42 Degree Gear Box, and he signed and sent back to Company C a Notice of Munitions list Items in which he affirmed, among other things, that "by accepting delivery of this material YOU (i.e. the purchaser) . . . warrant that you are not . . .  a non-U.S. Citizen/National or a Non-Permanent U.S. resident without a valid State/Commerce Department export authorization…."

BB.     On or about May 30, 2012, defendants BLUE LINES, MAHDI and MAHSA caused Company C to file a false SED, which indicated that Company C shipped "propellers and rotators and parts thereof" to MKB in Kuala Lumpur, when in truth and in fact the true destination of the shipment was Iran.

CC.     In an email message dated on or about May 31, 2012, defendant MAHSA informed Coconspirator A to expect a shipment from FedEx, air waybill number 798447827407, and requested Coconspirator A to send it to Tehran as soon as possible.

DD.     On or about June 2, 2012, MKB shipped a mechanical handling box to Mr. Abdol Reza Akmali in Tehran, Iran.


**Company D Shipment**

EE.     On or about June 6, 2012, defendant MAHDI, using the false name Aziz Bahari, sent a request for quotation from BLUE LINES via email to Company D in Sunrise, Florida, for a thin flux valve, which was a magnetic sensory device that electrically transmitted information to an aircraft's compass system regarding its orientation relative to Earth's magnetic field.

FF.     On or about June 12, 2012, defendant BLUE LINES submitted a formal purchase order to Company D for a thin flux valve, valued at $1,500, and listed MKB, C/O Freight Forwarder A in Malaysia as the "ship to" entity.

GG.     On or about June 19, 2012, Coconspirator A informed defendants MAHDI and MAHSA via email that Coconspirator A had received a shipment of a thin flux valve from Company D bearing air waybill number 2431385460, and she attached the air waybill and invoice related to the shipment to the email.

HH.     On or about June 19, 2012, defendant MAHSA replied to Coconspirator A's email and asked Coconspirator A to remove the "original invoice" from the package and arrange to ship the unit to Tehran, with the "relevant invoice," which defendant MAHSA would provide.

II.     On or about June 19, 2012, defendant MAHSA forwarded by email a copy of the "relevant invoice" to Coconspirator A, which indicated that it was for a valve and was issued by MKB, number 485119, was dated June 19, 2012 and listed the shipper as MKB and the ultimate consignee as Mr. Abdol Reza Akmali, Unit 3, 13th Floor, Negar Tower, Tehran, Iran.

JJ.     On or about June 21, 2012, MKB shipped a valve to Mr. Abdol Reza Akmali in Tehran, Iran.


**Company E Shipment**

KK.     On about April 22, 2012, defendant MAHSA, using the false name Katrina S.A., contacted Company B, in Canoga Park, California, via email and requested a quotation for an inertial reference unit ("IRU"), which was a key component of the integrated air data inertial reference system of both military and civilian aircraft, which supplied air data (airspeed, angle of

16

attack and altitude) and inertial reference (position and attitude) information to the pilots' electronic flight instrument system displays.

LL.     On or about April 30, 2012, after Company B informed defendant MAHSA that the IRU needed an export license, defendant MAHSA responded, "Please be informed that we have a sister company in Malaysia, and is you know our company is in UAE.  So, you have two cases for export license: UAE and Malaysia.  Please consider and inform me with which way you can get the export license sooner."

MM.   On or about May 2, 2012, defendant MAHSA received via email Company B's reply, which, among other statements, included the explanation that, "On export controlled items they are looking to make sure this part is not sent to a country, company, or persons who is on a banned list such as countries or militaries such as North Korea, Iran and others or companies or persons who might be affiliated or selling to terrorist or banned militaries."

NN.     On or about May 2, 2012, defendant MAHSA, using the false name Katrina S.A., responded to Company B by email:  "The end user is MKB Pacific Air in Malaysia.  As I said before they're our sister company.  So, I'll ask them to send you the purchase order, themselves. So, the purchaser and end user are the same. And I think it'll help to speed up the export license process.  Also, please be informed that this unit will be used for Airbus A300."

OO.     On or about May 3, 2012, after receiving an email from Company B, defendant MAHSA, using the false name Katrina Smich, confirmed that "MKB Pacific Air is the end user and that [the part] is not for resale to some other company and that the end use destination is Malaysia and not some other country," defendant MAHSA responded, "Hereby, I confirm that the MKB Pacific Air is the end user.  And they don't want to resell the unit.  MKB is a local

Cargo Operator.  They need this unit for their aircraft.  And their flight route is only from Malaysia to Indonesia."

PP.      On or about May 5, 2012, defendant MAHSA, using the false name Katrina Smich, sent a purchase order from MKB to Company B for the IRU, which indicated the shipment would be shipped to MKB care of Freight Forwarder A in Kuala Lumpur, Malaysia, and included a signed end user certificate, signed on May 5, 2012, by MKB Project Manager, "Katrina Smich," falsely certifying that the end user was MKB in Malaysia and that the IRU would not be re-exported.

QQ.      On or about May 23, 2012, defendant MAHSA, using the false name Katrina Smich, signed an additional end user certificate from Company E in which she falsely affirmed that MKB was the end user and that the company would not re-export, resell, or otherwise dispose of the articles to any other country or end user without a license from the United States.

RR.      On or about July 5, 2012, defendants BLUE LINES, MAHDI and MAHSA provided false end user information to Company E and caused Company E to file a false SED in the AES.

SS.      On or about July 17, 2012, defendant MAHDI requested that Coconspirator A send documents removed from Company E's shipment to defendant MAHDI in Tehran, Iran, which documents included a destination control statement at the bottom of this invoice stated the following:

> These commodities are authorized by the U.S. Government for export only to Malaysia for use by MKB Pacific Air SDN BHD. They may not be transferred , trans-shipped on a non-continuous voyage or otherwise be disposed of in any other country, either in their original form or after being incorporated into other items without the prior written approval of the U.S. Dept of State.

TT.     Defendants BLUE LINES, MAHDI and MAHSA and other conspirators failed to apply for, receive, and possess, and caused others to fail to apply for, receive, and possess a license from OFAC, located in the District of Columbia, to export any of the U.S.-origin goods set forth above from the United States to Iran.

(**Conspiracy to Unlawfully Export U.S.-Origin Goods to Iran
and to Defraud the United States by Dishonest Means,** in violation of 18 U.S.C. § 371)

**COUNTS 2-7**

**(Unlawful Exports or Attempted Unlawful Exports of U.S.-Origin Goods to Iran)**

17.     Paragraphs 1 through 8 and 13 of this Indictment are incorporated and realleged by reference in these Counts.

18.     On or about the dates listed as to each count below, within the District of Columbia and elsewhere, defendants

**BLUE LINES COMPANY,
MAHDI KEIVAN BAHARI, and
MAHSA KEIVAN BAHARI**

and other conspirators, did willfully export and reexport, attempt to export and reexport, and cause to be exported and reexported the U.S.-origin goods set out in Counts Two through Seven from the United States to Iran, without having first obtained the required license from OFAC, located in the District of Columbia.

| Count | Approx. Date of Export | Parts |
|:-----:|:----------------------:|:-----:|
| 2 | April 5, 2010 | Transceiver for Civil Aircraft (P/N 071-01519-010)<br><br>Indicator for Civil Aircraft (P/N 066-3084-32) |

| | | Install Kit for Civil Aircraft (P/N 050-03088-0000) Install Kit for Civil Aircraft (P/N IN-182A/812A) |
|---|---|---|
| 3 | September 30, 2011 | FCU (P/N 3905302101) Display Unit (P/N 20662155) SGU (P/N 9612660321) |
| 4 | May 24, 2012 | (2) 3-Axis Reference Gyros (P/N 2593996-333) |
| 5 | May 31, 2012 | 42 Degree Gearbox (P/N 212-040-003-023) |
| 6 | June 15, 2012 | Thin flux valve (P/N 620359) |
| 7 | July 8, 2012 | Inertial Reference Unit (P/N HG2030AD09) |

(**Unlawful Exports or Attempted Exports of U.S.-Origin Goods to Iran**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.203 and 560.204; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2.)

### COUNTS 8 – 12
### (False Statements)

19.     Paragraphs 1 through 11and 13 of this Indictment are incorporated and realleged

by reference in this Count.

20.     On or about the dates listed as to each count below, in the District of Columbia

and elsewhere, the defendants

**BLUE LINES COMPANY,**
**MAHDI KEIVAN BAHARI, and**
**MAHSA KEIVAN BAHARI**

in a matter within the jurisdiction of the executive branch of the United States government, did knowingly and willfully make and cause to be made materially false, fictitious, and fraudulent statements and representations, in that the defendants, aiding and abetting one another in the same, caused to be stated and represented, in shipping records, SEDs, and Automated Export System records the statements outlined below in counts 8–12, when the defendants there and then knew that these statements were false:

| Count | Approx. Date of False Statement | False Statements: | Relating to Shipment of: |
|---|---|---|---|
| 8 | April 5, 2010 | (i) The ultimate consignee was BLUE LINES in Istanbul, Turkey; (ii) The country of ultimate destination was Turkey; and (iii) No license was required (NLR) | • Transceiver for Civil Aircraft • Indicator for Civil Aircraft • Install Kit for Civil Aircraft • Install Kit for Civil Aircraft |
| 9 | September 30, 2011 | (i) The ultimate consignee was MKB; (ii) The country of ultimate destination was Malaysia; and (iii) No license was required (NLR) | • FCU • Display Unit • SGU |
| 10 | May 24, 2012 | (i) The ultimate consignee was MKB; (ii) The country of ultimate destination was Malaysia; and (iii) No license was required (NLR) | • (2) 3-Axis Reference Gyros |
| 11 | May 31, 2012 | (i) The ultimate consignee was MKB; | • 42 Degree Gearbox |

| | | | |
|---|---|---|---|
| | | (ii) The country of ultimate destination was Malaysia; and (iii) No license was required (NLR) | |
| 12 | July 8, 2012 | (i) The ultimate consignee was MKB; (ii) The country of ultimate destination was Malaysia; | • Inertial Reference Unit |

(**Material False Statements**, in violation of 18 U.S.C. § 1001; **Aiding and Abetting and Causing an Act to be Done**, in violation of 18 U.S.C. § 2.)

**Forfeiture Notice**
**(As to Counts 1-7)**

Upon conviction of the offenses alleged in Counts One through Seven, the defendants

**BLUE LINES COMPANY,**
**MAHDI KEIVAN BAHARI, and**
**MAHSA KEIVAN BAHARI**

shall forfeit to the United States any property, real or personal, which constitutes or is derived

from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461(c). The United States will also seek a forfeiture money judgment against the defendant

equal to the value of any property, real or personal, which constitutes or is derived from proceeds

traceable to this offense.

23.     If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property that cannot be divided without

          difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p).)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia

FOREPERSON OF THE GRAND JURY

Presented By:

23